**DAVIDOFF HUTCHER & CITRON LLP**
605 Third Avenue
New York, New York 10158
(914) 381-7400
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.

*Proposed Counsel to Debtor-in-Possession*

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---------------------------------------------------------------x

In re                                              :

                                                   :   Chapter 11

ROYAL BLUE REALTY HOLDINGS, INC.,                  :

                                                   :   Case No.  21-10802(LGB)

                              Debtor.              :

---------------------------------------------------------------x

**DEBTOR'S MOTION PURSUANT TO 11 U.S.C. §§ 105, 361, 362**
**AND 363 AND RULES 4001(b), 4001(d) AND 9014 OF THE**
**FEDERAL RULES OF BANKRUPTCY PROCEDURE FOR**
**ORDER (A) AUTHORIZING DEBTOR'S USE OF CASH**
**COLLATERAL AND PROVIDING ADEQUATE PROTECTION,**
**AND (B) SCHEDULING PRELIMINARY AND FINAL HEARINGS**

**TO: THE HONORABLE LISA G. BECKERMAN,**
**     UNITED STATES BANKRUPTCY JUDGE:**

Royal Blue Realty Holdings, Inc., the above captioned debtor-in-possession (the

"Debtor"), by its undersigned counsel, Davidoff Hutcher & Citron LLP, hereby moves (the

"Motion") pursuant to sections 105, 361, 362 and 363 of Title 11 of the United States Code (as

amended, the "Bankruptcy Code"), Rules 4001(b), 4001(d) and 9014 of the Federal Rules of

Bankruptcy Procedure (the "Bankruptcy Rules") and Local Rule 4001-2, seeking, inter alia, entry

of an interim order ("Interim Order") and a final order ("Final Order"), to the extent applicable

and without waiver of the debtor's claims, disputes and defenses,  authorizing and approving (i)

the Debtor's use of cash collateral in the ordinary course of its business affairs in accordance with

the proposed budget annexed to this Motion; (ii) the Debtor's provision of adequate protection to

Deutsche Bank  ("DB"), the Debtor's senior prepetition lender, in consideration for the use of cash

collateral; (iii) scheduling a final hearing (the "Final Hearing") on the Motion to consider entry of

a Final Order.   In support of the Motion, the Debtor respectfully refers to and incorporates the

contents of the declaration of Andrew Nichols, pursuant to 28 U.S.C. §1746 And Local Rule 1007-

2, dated April 26, 2021 (the "Nichols Declaration"), submitted in support of, among other things,

the relief sought by the Motion, and further respectfully sets forth and states as follows:

## PRELIMINARY STATEMENT

The Debtor's principal assets are located at 162-174 Christopher Street, New York, NY

10014. The Debtor is managed through Integrated Total Solutions, Inc., 801 Brickell Avenue,

Suite 900, Miami, FL 33131. The Debtor owns a subdivided unit, located at 162-174 Christopher

Street, New York, NY 10014, with 12 residential apartments. Of the 12 units, 9 of the leased units

are subject to disputed mortgages held by the American Home Mortgages Trust 2007-1 and 2006-

6 with DB as the trustee. Although the Debtor materially disputes the validity and enforceability

of the mortgages and contends that DB has no interest in the Debtor's cash and cash equivalents

(as explained below), out of an abundance of caution the Debtor requests that the Court authorize

requires the use of the Cash Collateral (as defined below) on a continued basis during the Chapter

11 case to pay ordinary operating expenses relating to its business, including among other things,

payroll, taxes and payments to ordinary course service providers and vendors. The Debtor is

offering DB adequate protection in the form of replacement liens in the same nature, extent and

validity as existed as of the Petition Date as set forth in the proposed Interim Order annexed hereto

as Exhibit A, and the Debtor intends to seek the Court's final approval for use of the Cash

Collateral at a final hearing.

By this Motion, the Debtor seeks entry of an Interim Order and further seeks use of Cash Collateral going forward on a final basis through the course of the Chapter 11 case pursuant to a Final Order upon sufficient notice to parties in interest including any creditors' committee, if and when one is appointed by the United States Trustee.

## JURISDICTION

1.      This Court has jurisdiction over this application pursuant to 28 U.S.C. §§ 157 and 1334, and the "Amended Standing Order of Reference" of the United States District Court for the Southern District of New York (Preska, C.J.), dated January 31, 2012. This is a core proceeding pursuant to 28 U.S.C. § 157(b). Venue of this proceeding and this Motion is proper pursuant to 28 U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is sections 105, 361, 362 and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b), 4001(d) and 9014.

## BACKGROUND

### The Bankruptcy Case

2.      On April 26, 2021 (the "Petition Date") the Debtor filed a voluntary petition for relief under Chapter 11 of the U.S. Bankruptcy Code, Title 11 and has been maintained in possession of its property and management of its business. The Debtor has, with certain unimportant exceptions, all the duties of a trustee. See, e.g. 11 U.S.C. §§1107 and 1108.

3.      On or around 1999, the Debtor was formed to acquire title to the commercial unit (the "Commercial Unit") of the 130 Barrow Street Condominium located at 162-174 Christopher Street, New York, New York (the "Barrow Condo").

4.      At the time of the Debtor's formation, it was 100% owned by the Serge Souto Family Limited Partnership, which was in turn 98% owned by the Serge Souto Irrevocable Intervivos Trust, 1% owned by John Souto, Serge's son, as a limited partner, and 1% owned by

Serge Souto Equities, Inc. as the general partner, which was in turn 100% owned by John Souto.

5.    When the Barrow Condo was formed, neither its original offering plan, nor any of its subsequent 15 amendments, ever included the Commercial Unit, which was apparently retained by the sponsor as commercial space outside of the offering.

6.    On behalf of the Debtor, John Souto then obtained 12 separate tax lot numbers for the Commercial Unit.  After obtaining such numbers, he then filed 3 amendments to the Barrow Condo Declaration, attempting to create 12 individual residential condos units - one for each tax lot within the Commercial Unit.

7.    John Souto also prepared an amendment to the 130 Barrow Street condo plan and a new, separate offering plan to sell the 12 units. Both were rejected by the NYS Attorney General's Office.

8.    Based on the foregoing, at no time from inception of the 130 Barrow Street Condominium to present has an offering plan or any amendment ever been accepted for filing by the New York State Attorney General's Office permitting the sale of all or any part of the Commercial Units (including the 12 tax lots comprising the same).  In addition, at no time has the Commercial Unit ever been subdivided into legal condominium units due to John Souto's failure to comply with the provisions of Section 339 of the NY RPL governing creation of legal condominium units.

9.    In June 2005, the Debtor and Serge Souto ("Serge"), as co-borrowers, entered into 12 consolidated *residential* loans (the "2005 CEMAS") with American Home Mortgage Acceptance, Inc., ("AHMA") as alleged assignee of the existing notes and mortgages of Washington Mutual Savings Bank ("Wamu"), and all of the loan docs were signed for Serge Souto by John Souto per a power of attorney. The 2005 CEMAS described the loans as

4

"residential" and the properties as condominiums. Upon information and belief, n*o assignment of rents were executed or recorded against any of the 12 units.*

10.      In September 2006, the Debtor and Serge refinanced with the 2005 CEMAS with 12 new consolidated loans (the "2016 CEMAS") for about $12,000,000.00 from American Home Mortgage ("AHM"). AHM ended up in bankruptcy in or about 2007, and the notes and mortgages were allegedly assigned to two, pass-through mortgage trusts formed by AHM with Deutsche Bank as trustee: the American Home Mortgage Assets Trust 2007-1, Mortgaged-Backed Passthrough Certificates Series 2007-1 (the "2007 Trust") and the American Home Mortgage Assets Trust 2006-6, Mortgaged-Backed Passthrough Certificates Series 2006-6 (the "2006 Trust"; the 2007 and 2006 Trusts being collectively referred to as the "Trusts").

11.      All the loan documents for the 2016 CEMAS, to the extent actually executed, were purportedly signed by John Souto as vice president of the Debtor and as attorney in fact for Serge per a purported power of attorney.

12.      At the time of both loans, Serge was living in an Alzheimer's facility and had little to no capacity. On or about January 2007, Serge Souto passed away.

13.      Deutsche Bank National Trust Company ("DB", or, the "Trustee") is the trustee of the Trusts, as can be seen in the bankruptcy filings for AHM. The Trustee or its affiliate was also making warehouse loans that allowed AHM to make and package the loans for the trusts, which the Trustee or its affiliate underwrote.

14.      The Trustee alleged the Debtor stopped making payments to AHM, and in 2009 and 2010, Trustee commenced 8 foreclosure actions, and in or about 2015, Trustee commenced 3 more foreclosure actions and in 2016 commenced a 12th action.

15.      It is the Debtor's belief that since there were no condo units that were ever

created, and no offering plan permitting the sale of all or any part of the Commercial Unit, it would be illegal to sell anything at a foreclosure sale, and the Trustee's mortgages are, therefore, unenforceable.

16.    The loans were supposedly transferred by AHM to 2007 Trust or the 2006 Trust, as applicable. In 7 of these cases, the Trustee could not produce the original notes and instead submitted lost note affidavits to the Court, but the Debtor does not believe that prior to the commencement of the foreclosures any of the original notes were legally assigned from AHMA to AHM, or from AHM to the trusts.

17.    In 2016, the Debtor made summary judgement motions to dismiss 3 of the foreclosure actions based on statute of limitation grounds, and succeeded in all 3 of those cases, resulting in 3 of the foreclosure actions being terminated and mortgages expunged of record for apartments 170, 174, and TH3.

18.    There are still currently 9 foreclosure actions pending against the other 9 tax lots within the Commercial Unit, and a receiver was appointed in March 2021.

19.    In 2012, the Debtor entered into a net lease (the "Lease") of the entire Commercial Unit with 174 Christopher Corporation ("174 Christopher Corp."), an entity purportedly owned and/or controlled by Neil Dansker.

20.    In May 2013, John Souto passed away, leaving his entire estate to my sister. We submitted the estate to probate and my sister was appointed executor and trustee.

21.    In 2015, 174 Christopher Corp. assigned the Lease to Comm-U LLC ("Comm-U").

22.    Comm-U is an entity formed in Florida by Andrew Nichols, managed by his mother, with a single member named N-Fam LLC ("N-Fam"). N-Fam is owned by Andrew

Nichols' sister and his three grown children.

23.    In 2017, and after three of Trustee's foreclosure cases were dismissed and its

mortgages expunged, the Lease was modified to create a separate lease (the "C-3 Lease") for the

three free and clear tax lots.  The Lease now only covers the 9 lots which Trustee is seeking to

foreclose.  Comm-U has, therefore, been acting as the lessee of the subject property since

December 2015. Comm-U has been entering into all leases, and collecting rents for the 12

apartments.

24.    Comm-U pays certain real estate taxes and all condo charges and insurance for

the Commercial Unit.  It also pays Debtor for the services of the Debtor's full-time super for the

property. Comm-U also pays fixed rent to the Debtor of approximately $102,000 a year (in fixed

installments of $6,500 per month, of which, approximately $4,875 of this amount is for the 9 tax

lots under the receivership), with annual catch-ups for shortfalls and credits for certain payments

made by Comm-U on the Debtor's behalf.

25.    The Debtor materially disputes the remaining 9 mortgages on multiple grounds,

including defects in pertinent documents, gaps in the chain of tile, inability to foreclose and other

issues as set forth and pending in the state court foreclosure actions.  The Debtor further disputes

the appointment of the Receiver, given the materially disputed nature of the 9 remaining

mortgages and the total lack of the Trustee's interests in underlying rents which could only be

perfected by possession of assignments of rents, which the Trustee simply does not have. The

Debtor intends to complete the adjudication and/or resolution of its claims and defenses with the

Trustee as the basis for a plan of reorganization and intends to reorganize and not liquidate in the

Chapter 11 proceedings by assuming its lease(s) with Comm-U for the entire Commercial Unit.

26.     The Debtor will utilize the Chapter 11 process to restructure its debt, seek out new capital and liquidate the claims of the creditors so that a Plan of Reorganization can be filed within a reasonable amount of time.  The Debtor is confident that proceeding in Chapter 11 is in the best interest of the Debtor, its estate, and the creditors as a whole

27.     It is therefore the Debtor's position that neither DB nor any other creditor or party has an interest in Debtor assets which may constitute the Cash Collateral, including but not limited to rents. Notwithstanding, and out of the abundance of caution, the Debtor requests the use of cash collateral to the extent required for the following reasons.

28.     The Debtor requires the use of cash collateral in order to pay ordinary and necessary business expenses including, but not limited to, payroll and related obligations, utilities, amounts owed to vendors and other suppliers of goods and services, insurance and other expenses that are critical to the operational needs of the Debtor's business pending confirmation of a plan of reorganization.

## **RELIEF REQUESTED**

29.     By this Motion, the Debtor respectfully requests, pursuant to sections 105, 361, 362, and 363 of the Bankruptcy Code and Bankruptcy Rules 4001(b), 4001(d) and 9014 the entry of an Interim Order and a Final Order, inter alia: (i) authorizing the Debtor to utilize Cash Collateral in accordance with the terms of an approved budget and grant limited adequate protection to DB; (ii) modifying the automatic stay; and (iii) scheduling a preliminary and final hearing(s) pursuant to Bankruptcy Rule 4001(b).

## AUTHORITY FOR USE OF CASH COLLATERAL

30.      A debtor-in-possession or trustee may be authorized pursuant to court order, to

use cash collateral in the ordinary course of its business operations under sections 363(c) and

1107 of the Bankruptcy Court.  This Court may condition such use, pursuant to section 363(e) of

the Bankruptcy Code as is necessary to provide adequate protection of any interest held therein

by any entity other than the debtor in possession.

31.      Courts repeatedly have recognized that use of cash collateral is appropriate where

necessary to preserve a debtor's ability to reorganize and thus maximize the value of an estate for

all interested parties. See In re Realty Southwest Assoc., 140 B.R. 360, 366 (Bankr. S.D.N.Y.

1992); H.R. Rep. No. 595, 95th Cong., 1st Sess. 344 (1977); 3 Collier on Bankruptcy 363.03

(Alan N. Resnick & Henry J. Sommer eds., 15th ed. rev. 2006); see also In re Dynaco, 162 B.R.

389, 396; In re Stein, 19 B.R. 458 (Bankr. E.D. Pa. 1982).  Bankruptcy Rule 4001(b) governs

authorization for utilizing cash collateral and provides that the court may permit a trustee to use

cash collateral prior to a final hearing to the extent necessary to avoid immediate and irreparable

harm. After a final hearing held on at least fourteen days' notice, the court may grant the

authority to use cash collateral on a permanent basis and other permanent relief requested herein.

32.      A debtor-in-possession or trustee may not use cash collateral unless "(A) each

entity that has an interest in such collateral consents; or (B) the court, after notice and a hearing,

authorizes such use, sale, or lease in accordance with the provisions of this section." 11 U.S.C. §

363(c)(2).

33.      The Debtor has determined, in the exercise of its business judgment, with the

assistance of its advisors, that it requires the use of its cash and related property.  The Debtor has

an immediate and critical need to use cash to pay, in accordance with the Budget, various parties

in the ordinary course of business and/or as authorized by the Court.  Among other things, the

continued use of Cash Collateral will enable the Debtor to continue to operate its business,

maintain relationships with the Debtor's vendors and creditors, pay the Debtor's employee, and

satisfy other ordinary operational costs that are essential to preserve estate value by continuing to

operate the Debtor's business in the ordinary course.  In the absence of the continued

authorization to use Cash Collateral, the Debtor's ability to operate the Debtor's business will be

jeopardized, causing immediate and irreparable harm to the Debtor's estate, creditors, employee,

and all other stakeholders by the loss of significant revenue. Thus, the Debtor's continued use of

Cash Collateral is essential to enable the Debtor to meet the obligations of its ordinary operating

costs and expenses during the pendency of the Chapter 11 Case.

### Adequate Protection

34.    Section 363(e) of the Bankruptcy Code provides that, "on request of an entity that

has an interest in property used, sold, or leased, or proposed to be used, sold, or leased, by the

trustee, the court, with or without a hearing, shall prohibit or condition such use, sale, or lease as

is necessary to provide adequate protection of such interest." 11 U.S.C. § 363(e).  Permissible

forms of adequate protection include periodic cash payments, additional liens, replacement liens,

and other forms of relief. 11 U.S.C. § 361. The purpose of adequate protection is to protect a

secured creditor from diminution in the value of its property interest in its collateral during the

period of use, sale, or lease. In re Kain, 86 B.R. 506, 513 (Bankr. W.D. Mich. 1988); see also

Delbridge v. Production Credit Assoc. and Fed. Land Bank, 104 B.R. 824, 827-28 (E.D. Mich.

1989); In re Ledgemere Land Corp., 116 B.R. 338, 343 (Bankr. D. Mass. 1990).  The appropriate

form of adequate protection must be determined on a case-by-case basis. See In re O'Connor,

808 F.2d 1393, 1396 (10th Cir. 1987); In re Martin, 761 F.2d 472, 474 (8th Cir. 1985).

35.     Pursuant to sections 361 and 363(e) of the Bankruptcy Code, as adequate protection of the disputed interests of DB in Cash Collateral to the extent of any diminution in value of its disputed interests in the Prepetition Collateral (including the Cash Collateral) resulting from the use of Cash Collateral, the authorized use, sale or lease of Prepetition Collateral, and the imposition of the automatic stay (collectively, the "Diminution in Value") pursuant to sections 361, 362, and 363 of the Bankruptcy Code, the Debtor proposes to grant to DB the following adequate protection:

i.      Replacement Liens.  Pursuant to sections 361 and 363(e) of the Bankruptcy Code, and in consideration of the stipulations and consents set forth herein, as adequate protection for any postpetition Diminution in Value of DB's interests in the Prepetition Collateral (including the Cash Collateral), DB should be granted additional and replacement valid, binding, enforceable, non-avoidable, and automatically perfected postpetition security interests in and liens (the "Replacement Liens"), without the necessity of the execution by the Debtor (or recordation or other filing) of security agreements, control agreements, pledge agreements, financing statements, mortgages, or other similar documents, on the Debtor's property, whether now owned or hereafter acquired or existing and wherever located, of the Debtor and the Debtor's "estate" (as created pursuant to section 541(a) of the Bankruptcy Code), of any kind or nature whatsoever, real or personal, tangible or intangible, and now existing or hereafter acquired or created, including, without limitation, all cash, accounts, inventory, goods, contract rights, instruments, documents, chattel paper, patents, trademarks, copyrights, and licenses therefor, accounts receivable, receivables and receivables records, general intangibles, payment intangibles, tax or other refunds, insurance proceeds, letters of credit, contracts, owned real estate, real property leaseholds, fixtures, deposit accounts, commercial tort claims, securities accounts, instruments, investment, property,

letter-of-credit rights, supporting obligations, machinery and equipment, real property, leases (and proceeds from the disposition thereof), other equity or ownership interests, including equity interests in any subsidiaries and non-wholly owned subsidiaries, money, investment property, and causes of action (other than avoidance actions arising under chapter 5 of the Bankruptcy Code), and all products, proceeds and supporting obligations of the foregoing, whether in existence on the Petition Date or thereafter created, acquired, or arising and wherever located BUT ONLY to the same extent that DB had a valid and enforceable lien and security interest on such property as of the Petition Date and in the continuing order of priority that may have existed as of the Petition Date (collectively, the "Postpetition Collateral");

ii.     For the avoidance of doubt, the Replacement Liens shall, however, (a) be subject to (i) the payment of all statutory fees under 28 U.S.C. section 1930 and 37 U.S.C. Section 3717, (b) allowed claims of the Debtor's professionals duly retained under Section 327 of the Bankruptcy Code and subject to allowance under Sections 330 or 331 of the Bankruptcy Code, and (c) the claims of a hypothetical Chapter 7 trustee not to exceed $20,000 and (b)  not be secured by any proceeds or recoveries from avoidance actions under Chapter 5 of the Bankruptcy Code (the "Avoidance Actions"; collectively the "Carve-Out").).

36.     Based on the foregoing, the Debtor respectfully submits that the Replacement Liens  will sufficiently protect DB's disputed interests in the Cash Collateral from any diminution in value, are permissible under the Bankruptcy Code, and should be approved.

A.     **Budget**

37.     In connection with its emergency motion, the Debtor has prepared a long-term budget (the "Budget"), which identifies anticipated receipts and disbursements over the anticipated duration of the Chapter 11 case including the next thirteen (13) weeks.  A copy of the Budget is

annexed hereto as Exhibit "B". The Debtor believes, but does not warrant, the Budget will be adequate, considering all available assets, to pay all operating administrative expenses due or accruing during the period covered by the Budget, and a substantial portion of professional expenses.

**B.      Termination**

38.      The Debtor shall be entitled to use Cash Collateral in accordance with the Budget, effective upon entry of the Interim Order through the day that is one-day after the date on which the Court schedules the Final Hearing, or a continued interim hearing on the Cash Collateral Motion (the "Termination Date").

**C.      The Automatic Stay Should Be Modified on a Limited Basis**

39.      The relief requested herein contemplates a modification of the automatic stay (to the extent applicable) to permit the Debtor to grant the security interests and liens, described above and to perform such acts as may be requested to assure the perfection and priority of such security interests and liens.

40.      Stay modifications of this kind are ordinary and standard features of cash collateral motions, in the Debtor's business judgment, are reasonable and fair under the present circumstances.

**D.      Interim Approval Should Be Granted**

41.      Bankruptcy Rule 4001(b) provides that a final hearing on a motion to use cash collateral may not be commenced earlier than 14 days after the service of such motion.  Upon request, however, the Court is empowered to conduct a preliminary expedited hearing on the motion and the use of cash collateral to the extent necessary to avoid immediate and irreparable harm to a debtor's estate pending a final hearing.

42.     Pursuant to Bankruptcy Rule 4001(b), the Debtor requests that the Court conduct an expedited interim hearing on this motion and (i) authorize the Debtor to use Cash Collateral on an interim basis in accordance with the Budget, pending entry of a final order, in order to (a) maintain ongoing operations of the Debtor; (b) fund the administration of the Bankruptcy Case; and (c) avoid immediate and irreparable harm and prejudice to the Debtor's estate, business operations and all parties in interest, and (ii) schedule the Final Hearing.

43.     The Debtor has urgent and immediate need for cash to continue to operate. Currently, the Debtor, assuming DB's interests are valid and enforceable, does not have sufficient unencumbered funds with which to operate the Debtor's business and in fact, all funds are could be argued, subject to the Debtor's dispute of same, are DB's Cash Collateral.  Absent authorization from the Court to use Cash Collateral, as requested, on an interim basis pending the Final Hearing, the Debtor will be immediately and irreparably harmed.  The ability to use Cash Collateral will allow the Debtor to continue ordinary course operations.  The Debtor's inability to fund the Debtor's operations and fund its payroll would have a disastrous effect on the value of the Debtor's Estate to the detriment of all parties in interest.  Accordingly, the interim relief requested is critical to preserving the Debtor's ability to reorganize its affairs through a plan.

## NOTICE OF FINAL HEARING

44.     Notice of this Motion and proposed Interim Order was given by email or overnight delivery of a copy to (i) counsel to DB, (ii); the Office of the United States Trustee for the Southern District of New York, U.S. Federal Office Building, 201 Varick Street, Room 1006, New York, New York 10014, (iii) each of the Debtor's known secured creditors, (iv) the Receiver, and (v) each of the Debtor's twenty (20) largest unsecured creditors (collectively, the "Notice Parties").

Pursuant to Bankruptcy Rule 4001, the Debtor respectfully requests that he be authorized to serve notice of the Final Hearing and a proposed Final Cash Collateral Order upon: (a) the parties having been given notice of the Interim Hearing; (b) any party which has filed prior to such date a request for notices with this Court; (c) counsel for any Creditors' Committee, if appointed by such date; and (d) any other party to whom notice is required to be given pursuant to Bankruptcy Rules 2002 and 4001 and the Local Rules.  In light of the nature of the relief requested herein, the Debtor submits that no other or further notice need be given.

## NO PRIOR REQUEST

45.    No previous request for the relief sought in this Cash Collateral Motion has been made to this or any other court.

**WHEREFORE**, the Debtor respectfully requests entry of the Interim Order and, following the Final Hearing, entry of a Final Order, and such other and further relief as this Court deems just.

Dated:   New York, New York
              April276, 2021

DAVIDOFF HUTCHER & CITRON LLP
*Proposed Attorneys for the Debtor*
605 Third Avenue
New York, New York 10158
(914) 381-7400


By: */s/ Robert L. Rattet*
Robert L. Rattet, Esq.
Jonathan S. Pasternak, Esq.